UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ANDREA TARDIF-BRANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil No. 04-132-B-S |
| KENNEBEC VALLEY COMMUNITY | ) | |
| ACTION PROGRAM, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

Andrea Tardif-Brann contends that her former employer, Kennebec Valley Community

Action Program (KVCAP), subjected her to a hostile work environment, retaliated against her

and constructively discharged her after she demanded that her supervisor do something to stop a

certain male co-worker from sexually harassing her and other women in the workplace.  Now

pending is KVCAP's motion for summary judgment.  I recommend that the court grant the

motion, in part.

### Facts

The following statement of facts is drawn from the parties' statements of material facts in

accordance with this District's Local Rule 56.[1]  Pursuant to Rule 56 of the Federal Rules of Civil

---

[1]      In its reply memorandum (Docket No. 39) KVCAP takes issue with the form and content of the Tardif-Brann Affidavit (Docket No. 32) and the plaintiff's statement of additional material facts, to the extent those facts are supported by the affidavit.  Were it not for the recent amendment to Local Rule 56 (e) it appears virtually certain that defendant would have filed a Motion to Strike the affidavit.  In its reply to plaintiff's additional statement of facts and in its memorandum defendant noted its various objections.  If I included the facts in my statement of material fact I have indicated in a footnote the nature of defendant's objection and why I included the fact in spite of the objection.  To the extent the numerous objections pertain to irrelevant facts, or if I agreed with defendant that the statement was conclusory or otherwise not entitled to any evidentiary weight, I have simply disregarded that item in reciting the material facts.

Procedure, all evidentiary disputes appropriately generated by the parties' statements have been resolved, for purposes of summary judgment only, in favor of the non-movant. <u>Merchants Ins. Co. v. United States Fid. & Guar. Co.</u>, 143 F.3d 5, 7 (1st Cir. 1998).

Kennebec Valley Community Action Program maintains an office in Augusta. Tardif-Brann worked in the Augusta office in the "transportation department" from 1995 until November 5, 2003. (Pl.'s Statement, Docket No. 34, ¶ 1.) Working with her in that office were the following individuals: Robert Simpson, the manager; Tammy Bretton, a volunteer dispatcher; Theresa Hooper, a data entry clerk; and Anna May Pooler, a secretary. (<u>Id.</u> ¶ 2.) Simpson had his own office. Tardif-Brann, Bretton and Hooper shared a common space, and Pooler worked across a hallway from them. Simpson's office was about fifteen feet from the common space. (<u>Id.</u> ¶ 3.) In addition to these office workers, KVCAP employed the following drivers: Hiram Cochran, Marvin Parker, and Debbie Morin. (<u>Id.</u> ¶ 4.)

There is no evidence of any blemish on Tardif-Brann's employment record prior to the year 2000. To the contrary, the evaluations she received for a variety of different positions she held between 1995 and 2000 were positive and she was thrice promoted in that timeframe. (Pl.'s Statement ¶¶ 5-10.) Thereafter, Tardif-Brann was demoted from a "team leader" position and eventually moved in the summer of 2001 into a position called "van dispatcher/fleet maintenance supervisor," where she remained until her separation from employment in November 2003. (Def.'s Statement, Docket No. 19, ¶¶ 8-9.) In that position, Tardif-Brann's responsibilities included scheduling KVCAP van drivers to fill requests for transportation, preparing daily and weekly schedules for van drivers and developing pick-up and delivery routes that met the needs of KVCAP's clients. (<u>Id.</u> ¶ 10.) It is a difficult job because the transportation service office is fast paced and hectic, with approximately 300 trips being dispatched on a daily basis. (Def.'s

Statement ¶¶ 11, 106-109.)  In that position Tardif-Brann received generally positive reviews from management, but also received some critical performance evaluations, including complaints from several of KVCAP's drivers in the fall of 2003, described below.  (Def.'s Statement ¶¶ 6-8; Pl.'s Statement ¶¶ 11-17; Def.'s Reply Statement ¶¶ 11-17.)

According to Tardif-Brann, Mr. Cochran could be relied upon to make some offensive comment about her body parts when he came into the office, drawing attention to her thighs and buttocks.  (Pl.'s Statement ¶¶ 18-19.)  On one occasion, after Andrea had highlighted her hair blonde, Cochran asked her if she had another bottle so that she might have a "snatch to match." (Id. ¶ 19.)[2]  Cochran could also be expected to tell sex jokes when he came into the office.[3]  (Id. ¶¶ 20, 67.)  According to Tardif-Brann, she would tell Cochran she did not want to hear the jokes.  (Id.)  According to Cochran, Tardif-Brann participated in the joke telling.  (Def.'s Reply Statement ¶ 20.)  It appears that others did as well—at least to some extent—however uncomfortable they may have felt.  (Id. ¶ 42.)  Tardif-Brann asserts that Cochran was also wont to whistle while his eyes roved over her body and that he would proposition her with the line, "If your man isn't taking care of you at home, just give me a call."  (Pl.'s Statement ¶ 21.)  Tardif-Brann also describes certain physical intrusions by Cochran.  She asserts that on one occasion Cochran told her that his bus/van would not start and that, when she went outside to look at the

---

[2]      KVCAP objects to Tardif-Brann's assertions that Cochran commented about Tardif-Brann's thighs and buttocks and that Cochran made the lewd comment about highlighting her hair based on Tardif-Brann's failure to make either assertion during a workers' compensation hearing.  (Def.'s Reply Statement ¶ 18.)  However, KVCAP fails to demonstrate that the substance of either statement is *contradicted* by any prior sworn testimony by Tardif-Brann.  KVCAP cites a solitary page of the transcript from that hearing, without producing the immediately following page onto which Tardif-Brann's testimony extends, and the only apparent tension between the prior testimony and Tardif-Brann's assertion in her summary judgment affidavit concerns whether or not Cochran made such statements in 2002 or in 2003.  Also, KVCAP's denial of paragraph 19, statement 1, of Tardif-Brann's statement of additional facts is not supported by a record citation.  Tardif-Brann continually cites to both her complaint and the corresponding paragraphs of her affidavit.  Of course the citations to the complaint are improper, but they do tend to undercut KVCAP's assertion that these affidavit statements are somehow contradictory to prior sworn testimony and only invented for summary judgment purposes.  I have "bled" paragraphs 18 and 19 into a singular statement that the comments were made, but have not attached any dates thereto, accepting that for summary judgment purposes the comments were made sometime during the relevant time period.

[3]      Not all of Cochran's joking was sexual in nature.  (Pl.'s Statement ¶ 42.)

gauges in Cochran's van, he grabbed her and forcibly kissed her.  Tardif-Brann asserts that she tried to push Cochran away, but could not do so and, when he let her go, she told him never to do it again.  (Id. ¶ 24.)  Tardif-Brann describes another incident in which Cochran grabbed her in the office and hugged her tight.  She asserts that she tried to get away, but could not.  According to Tardif-Brann, Cochran rubbed against her breast and stated, "I love a good booby hug."  Tardif-Brann asserts that after Cochran let her go, she retreated to the bathroom to calm down and felt humiliated and upset.  (Id. ¶ 25.)  Additionally, Tardif-Brann says that Cochran more than once kissed, attempted to kiss or attempted to bite her on the back of her neck.  (Id. ¶ 26.)  Cochran's own testimony appears to support this assertion.  (Id. ¶ 68.)  Tardif-Brann would consistently tell Cochran to stop his behavior and to leave her alone, to no avail.  (Id. ¶ 27.)  She also asserts that Anna-May Pooler, Tammie Breton, Theresa Hooper and she would frequently discuss how to avoid Cochran.  (Id. ¶ 27.)  Hooper also recalls talking in a group about Cochran's inappropriate behavior.  (Id., ¶ 44.)  Hooper testified to hearing Tardif-Brann tell Cochran to get away from her and described Cochran's comments about breasts as "typical."  (Id. ¶¶ 29, 44; Hooper Depo., Docket No. 24, at 30.)  Based on Tardif-Brann's description to her of Cochran's kissing misdeeds, Pooler felt "uncomfortable" and "bad" for Tardif-Brann.  (Pl.'s Statement ¶ 30.)  Tardif-Brann asserts that Cochran's conduct caused her to feel uneasy while she was at work, to take measures while at work to make sure she was not alone with Cochran and to suffer emotional distress and to seek professional counseling for emotional distress.  (Id. ¶ 32.)

Tardif-Brann asserts that other women in the office were also subjected to similar commentary and advances.  For example, both she and Tammie Breton describe Cochran's habit of referring to Tammie Breton as "TBBT," which stood for "Tammie Breton's Big Tits."  (Id. ¶¶ 22, 46, 53.)  On occasion, Cochran would dispense with this awkward acronym and simply refer

4

to Breton as "Breton Big Boobs" or "Tammy Big Boobs" instead.  (Id. ¶¶ 54, 66 (Cochran's admission).)  Tardif-Brann asserts that she observed Breton ignoring Cochran on these occasions or acting "visibly rude" toward him.  (Id.)  Hooper similarly testified that she saw Breton become angry at Cochran and that Breton told her that she felt bad about it.  (Id. ¶¶ 43, 55, 57-58.) Breton, however, testified at her deposition that being called TBBT, Tammy Big Boobs and Breton Big Boobs did not really upset her.  (Def.'s Reply Statement ¶ 22.)  Theresa Hooper's breasts were also a topic of conversation for Cochran, who allegedly stated in the office that he would crawl through broken glass to get to her breasts[4] and, on occasion, would comment about how big Hooper's breasts were.  (Pl.'s Statement ¶¶ 23, 36-37.)  Hooper thought that Cochran was a pervert.[5]  (Id. ¶ 34.)  She testified that she considered him a pervert because he liked to tell a lot of dirty jokes and he liked to hug and kiss and flirt.  (Id.)  According to Hooper, Cochran tried to hug or kiss her, but she would not let him.  (Id.)  After a while, she got sick of Cochran, and she told him to back off.  (Id.)  Hooper describes feeling uncomfortable enough in Cochran's presence to go into the bathroom or kitchen when she saw him coming into the office and to be careful or conscious about what she wore to work for clothing.  (Id. ¶¶ 35, 39, 41.)  Hooper testified that Cochran stopped bothering her when she confronted him, but only for a while.  (Id. ¶ 40.)  Hooper left KVCAP in August 2003, a couple months before Tardif-Brann left.  (Id. ¶ 48.)

Ms. Pooler testified that Cochran was a "jokester" and told some offensive jokes having a sexual connotation.  (Id. ¶ 62, Pooler Depo., Docket No. 27, at 30.)  Pooler asked Cochran not to

---

[4]      KVCAP objects to this statement for the reason that Tardif-Brann did not mention Cochran's "crawl through broken glass" comment during her workers' compensation testimony or in her interrogatory answers. KVCAP fails to refer the court to contradictory prior testimony.  (Def.'s Reply Statement ¶ 23.)  It appears to me that the affidavit provides more specificity about Cochran's comments regarding Hooper's breasts, but it does not appear to introduce new substantive allegations or to contradict prior testimony.

[5]      KVCAP objects to this characterization, but its counsel broadly asked Hooper during her deposition, "How would you describe [Cochran]?"  (Hooper Depo., Docket No. 24, at 14.)

tell her his jokes and he acquiesced.  (Pl.'s Statement ¶ 63.)  It appears from her deposition testimony that Pooler heard little of Cochran's office banter because she was across the hall from the shared office space and was frequently on the phone working.  (Pooler Depo. at 29; Pl.'s Statement ¶ 3.)[6]

Hiram Cochran was a "spare driver" for KVCAP, which means he did not work on a full-time basis.  (Def.'s Reply Statement, Docket No. 40, ¶ 4.)  (Pl.'s Statement ¶ 5; Def.'s Statement ¶ 45; Def.'s Reply Statement ¶ 5.)

KVCAP's sexual harassment policy states that sexual harassment is illegal and offers as examples of harassment the following types of conduct:  whistles, leering, ogling, staring, making sexual remarks (including slurs, jokes, or degrading comments of a sexual nature), and unwelcome hugging, touching or kissing.  (Pl.'s Statement ¶¶ 70-71.)  The policy instructs that employees who feel victimized by sexual harassment should immediately report it to the human resources director, the executive director or the Maine Human Rights Commission, a procedure that Tardif-Brann never utilized despite having knowledge of the policy from KVCAP's employee handbook and from sexual harassment training, including a sexual harassment training session conducted by KVCAP on September 30, 2003.  (Def.'s Statement ¶¶ 71-75.)  In addition to a sexual harassment policy and training, KVCAP also has a peaceable workplace policy.  (Id. ¶ 76.)  Tardif-Brann was a member of the committee that drafted KVCAP's peaceable workplace policy, and was fully aware of the procedures for reporting violations of that policy.  (Id. ¶ 77.)  Although Tardif-Brann did not make a report of sexual harassment to KVCAP's HR director, executive director or to the MHRC, she maintains that she did report sexual harassment to

---

[6]     Pooler also describes an incident in which Cochran kissed her on the lips but this event was neither observed by anyone in the office nor reported to Mr. Simpson and therefore could neither have contributed toward Tardif-Brann's perception of a hostile work environment nor placed KVCAP on notice of Cochran's conduct.  (Pooler Depo. at 32-34.)  Still, this testimony tends to corroborate Tardif-Brann's description of Cochran as an equal opportunity harasser.

Simpson, her office manager.[7]  According to Tardif-Brann, whose testimony the court must credit at this juncture,[8] she complained to Bob Simpson about Cochran's behavior sometime in 2003, describing Cochran's forcible kiss, his comments about her body parts, how Cochran would walk up behind her and try to kiss or bite her neck and of his constant dirty jokes.  (Id. ¶ 75.)  Tardif-Brann states that Simpson merely held up his hands and said something like, "Oh God."  (Id. ¶ 76.)  Following the "booby hug" incident (for which no specific date has been provided), Tardif-Brann again complained to Simpson.  According to Tardif-Brann, Simpson's response was merely that Cochran better not do that "shit" in front of him.  (Id. ¶ 77.)  KVCAP's sexual harassment policy places a burden on managers who become aware of harassment to take prompt and appropriate action, including investigating any complaint and, where warranted, taking disciplinary action.  (Pl.'s Statement ¶¶ 72-73.)

On October 24, 2003, three KVCAP drivers, Gladys Case, Debbie Morin, and Marvin Parker, held a meeting with Maayan Lahti, KVCAP's former staff development director, to discuss their criticisms of Tardif-Brann.  (Def.'s Statement ¶ 12.)  On or about Monday, October 27, 2003, one of Tardif-Brann's co-workers, Hiram Cochran, mailed to KVCAP's Waterville office a letter which Cochran had prepared and signed, and which was also signed by six other employee drivers.  (Id. ¶ 13.)  The Cochran letter supported the criticisms leveled by Case, Morin and Parker at Tardif-Brann's performance of the dispatching function of her job.  (Id. ¶¶ 14-15.)  On November 3, 2003, one or more of KVCAP's drivers complained to Tardif-Brann about scheduling issues in a manner that Tardif-Brann found to be inappropriate, calling her stupid and a liar.  (Pl.'s Statement ¶¶ 92-93.)  Tardif-Brann asserts that she went into Simpson's office and asked Simpson to address the matter, saying she might have to resign if three of KVCAP's

---

[7]       Tardif-Brann also stated at her deposition that she was reluctant to make a report over Simpson's head because he had previously reprimanded her for taking a matter above his head.  (Def.'s Statement ¶ 79.)

[8]       Simpson denies that Tardif-Brann ever spoke to him about Cochran.  (Def.'s Reply Statement ¶ 77.)

drivers were still employed in two weeks.  (Id. ¶ 94.)  KVCAP directs the court to a "Dear Bob" email, written by Tardif-Brann on November 3, 2003, in which Tardif-Brann asserted that she was on medication because of the anxiety she experienced at work, "which is directly related to these three individuals and their constant complaining and negativity."  (Def.'s Reply Statement ¶ 94.)  Tardif-Brann also asserted in the email that she would "mostly [sic] likely be forced to hand in my resignation, if these three individuals are still here, in two weeks" because she could "no longer deal with their unethical, unscrupulous behavior and actions."  (Id.; Kosma Aff., Ex. 4.)  According to Tardif-Brann's summary judgment affidavit, she never intended to state her intention to resign so forcefully, but after first speaking with Simpson in his office about the problem, he told her to put her complaint in writing and to change it to state that she would resign.  (Pl.'s Statement ¶¶ 95-96.)  However, during her sworn testimony before a workers' compensation board hearing officer her characterization was somewhat different.  At the hearing she was asked whether she felt that Simpson was asking her to change the wording and she responded, "Like I said, in all fairness and honesty to Mr. Simpson, he may not have, but I perceived it as such."  (Def.'s Statement ¶¶ 24-25; Def.'s Reply Statement ¶ 96; Workers' Comp. Hr'g Tr., Docket No. 29, at 72.)  A couple days later, Tardif-Brann was told that her resignation had been accepted.  Tardif-Brann told Simpson that the letter was not a resignation letter, but a plea for help.  Nevertheless, KVCAP stood by its decision.  (Pl.'s Statement ¶ 97.)  According to KVCAP, the managers and supervisors in control of Tardif-Brann's employment viewed her letter as communicating an "insubordinate ultimatum" and as warranting her termination, although they couch their assertion in terms of "accepting" Tardif-Brann's "resignation."  (Def.'s Statement ¶¶ 26-30.)

After Tardif-Brann's departure KVCAP conducted an investigation concerning Cochran's behavior in the office.  (Pl.'s Statement ¶ 83.)  This investigation was conducted by Patricia Kosma, KVCAP's deputy director, and was begun after Kosma received a November 21, 2003, email from Tardif-Brann in which Tardif-Brann asserted that she had been subjected to sexual harassment while employed at KVCAP.  (Id. ¶ 84.)  Kosma spoke to people in the office, including Simpson, Breton, Pooler and Cochran, and concluded that there was no evidence to substantiate Tardif-Brann's claim that she was subjected to sexual harassment.  (Id. ¶ 89; Def.'s Statement ¶ 36.)  Simpson testified during his deposition that Cochran was never subjected to discipline as a result of the investigation because Tardif-Brann's accusations were deemed unsubstantiated.  (Id. ¶ 90; Def.'s Reply Statement ¶ 90.)  Brian Burgess, who worked dispatch after Tardif-Brann's departure, testified that he never heard Cochran making any lewd comments about the female employees' body parts, something that even Cochran admits to doing prior to Tardif-Brann's departure.  (Def.'s Statement ¶ 111.)  Cochran resigned from KVCAP a few weeks after his deposition.  (Pl.'s Statement ¶ 91.)

KVCAP asserts that "[j]oking did not occur when Mr. Simpson was in the office." (Def.'s Statement ¶ 105.)  However, in Ms. Kosma's report of her "internal investigation" she reports that Simpson responded, when asked whether he had witnessed inappropriate "sexual comments made at work," that he heard "joking where all parties agreed to the content." (Simpson Depo. Ex. 1, Docket No. 25, Elec. Attach. 1.)

### Discussion

A movant is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of

the suit under the governing law," and the dispute is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the

Court must view the available summary judgment record in the light most favorable to the

nonmoving party and credit all favorable inferences that might reasonably be drawn from the

facts without resort to speculation.  Merchants Ins. Co., 143 at 7.  If such facts and inferences

could support a favorable verdict for the nonmoving party, then there is a trial-worthy

controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of Kingston,

303 F.3d 91, 94 (1st Cir. 2002).

     Tardif-Brann's complaint recites the following four causes of action, by count:

I.      A "hostile environment" claim brought pursuant to Title VII;

II.     A "retaliatory discharge" claim, also brought pursuant to Title VII;

III.    A "constructive discharge" claim that does not reference any particular statutory
        basis; and

IV.    A "hostile environment" claim premised on the protections afforded under the
        Maine Human Rights Act (MHRA).

(Compl., Docket No. 1.)  KVCAP's first contention is that summary judgment must enter against

counts I, II and III "as the complaint does not establish that plaintiff received a right-to-sue letter

from the EEOC prior to filing suit."  (Mot. Summ. J., Docket No. 18, at 3.)  From there, KVCAP

challenges Tardif-Brann's ability to generate a genuine issue of fact whether any sex-related

conduct or speech in the office was "unwelcome" (id. at 7-10), sufficiently severe or pervasive to

alter the terms and conditions of her employment (id. at 11-16) or even objectively offensive (id.

at 16-17).  Next, KVCAP contends that there is no basis on which to impose vicarious liability because there is no evidence that KVCAP knew of the alleged harassment prior to her "resignation" or that KVCAP failed to take prompt and appropriate action once the matter was brought to its attention.  (Id. at 19-22.)  From there, KVCAP asserts that there is insufficient evidence to maintain a retaliation claim because its justification for terminating Tardif-Brann's employment ("accepting her retirement" because she was "insubordinate") could not be considered pretextual.  (Id. at 22-24).  Finally, KVCAP argues that a constructive discharge theory does not fit the facts because Tardif-Brann, in essence, did not really want to resign and, therefore, conditions could not have been intolerable.  (Id. at 24-27.)  I address these several contentions in *seriatim*.

## I.      **"Right to Sue"**

KVCAP maintains that judgment must enter against all of Tardif-Brann's Title VII claims because she filed suit on August 6, 2004, more than 15 days after having received a right-to-sue letter from the Maine Human Rights Commission (MHRC) but before receiving a separate right-to-sue letter from the Equal Employment Opportunity Commission (EEOC).  KVCAP characterizes this as a failure to exhaust administrative remedies that bars Tardif-Brann from maintaining the Title VII claims over which the EEOC had jurisdiction.  (Id. at 3-5.)  Tardif-Brann responds that this defense was waived because KVCAP did not identify it in response to Tardif-Brann's interrogatory requesting that KVCAP describe every fact supporting its affirmative defenses.  (Summ. J. Opp'n Mem., Docket No. 36, at 4-5.)  In addition, Tardif-Brann argues that she did receive a right-to-sue letter from the EEOC, but misplaced her copy of the letter.  (Id. at 5-6.)  Tardif-Brann has obtained a letter from the EEOC indicating that the EEOC did treat Tardif-Brann's filings with the MHRC and the MHRC's administrative process as

satisfying the EEOC's administrative processing requirements.  (Aff. of Guy Loranger, Docket No. 33, Ex. 9, p.8.)  That letter states, among other things, that the EEOC waited until September 21, 2004, (i.e., after the complaint was filed in this court) to grant "contract credit to the MHRC" and to dismiss the charge "with a Notice of Right to Sue."  (Id.)

"There are several requirements that a plaintiff must meet, pursuant to Title VII, prior to filing suit in federal court.  For example, a plaintiff must file a timely EEOC charge against the discriminatory party, and receive notice of a right to sue."  McKinnon v. Kwong Wah Rest., 83 F.3d 498, 504 (1st Cir. 1996) (citing 42 U.S.C. § 2000e-5).  Failure to comply with these requirements will not deprive the court of jurisdiction over a Title VII claim.  Instead, the requirements are in the nature of "conditions precedent" and, as such, are subject to waiver, estoppel and equitable tolling.  Id. at 505.  As for waiver, "the requirement of obtaining a right-to-sue letter may be waived by the parties or the court."  Parry v. Mohawk Motors of Mich., Inc., 236 F.3d 299, 309 (6th Cir. 2000) (emphasis added).  The issue presented here is somewhat frustrating because KVCAP seeks to take advantage of a procedural technicality that caused it absolutely no harm and Tardif-Brann wants the court to find that KVCAP waived the defense based on another technicality.  Fortunately, this ground has been plowed before.  Based on my independent research, it appears that there is an emerging trend toward recognizing a narrow equitable exception to the requirement that a plaintiff wait to file suit until after a right-to-sue letter is in his or her possession.  That exception applies when the right-to-sue letter is received by the plaintiff shortly after filing his or her case and before the defendant raises the statutory bar by way of a dispositive motion, assuming that the defendant fails to demonstrate any prejudice.  See, e.g., id. at 309-10 (reversing district court's dismissal of an ADA claim where the plaintiff received a right-to-sue letter "prior to the district court's order granting summary judgment");

Portis v. Ohio, 141 F.3d 632, 634-635 (6th Cir. 1998) (observing that "the proper time for [a defendant] to raise this argument [is] between the filing of the lawsuit and [the plaintiff's] receipt of the letter" and collecting cases described as reaching "equivalent results").  The circumstances presented in this case fit squarely within this rule.  The right-to-sue letter issued before KVCAP filed its answer (and well before this motion) and KVCAP makes no showing of prejudice.[9]

## II.    Hostile Work Environment

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Included within this broad prohibition is the maintenance or tolerance of a "discriminatorily hostile or abusive environment" by an employer.  Harris v. Forklift Sys., 510 U.S. 17, 21 (1993); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 394 (1st Cir. 2002).

> In order to prove a hostile work environment, a plaintiff must show that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment. The harassment must be "objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  In determining whether a

---

[9]      In support of its position, KVCAP cites Tang v. State of Rhode Island, 163 F.3d 7 (1st Cir. 1998), and McKinnon v. Kwong Wah Restaurant, 83 F.3d 498 (1st Cir. 1996).  In both opinions the First Circuit referred to the general prerequisites to filing a Title VII suit, including the requirement that the plaintiff first obtain a right-to-sue letter.  However, in neither opinion did the Court bar the Title VII claims based on failure of the plaintiff to receive such a letter.  In Tang, the Court considered an argument by the non-prevailing plaintiff that she should not be required to pay attorney's fees to the defendant because she had received a right-to-sue letter from the EEOC.  163 F.3d at 14 n.8.  The Court merely recited the general requirement that a plaintiff receive a right-to-sue letter before bringing suit.  Id.  The issue of whether an exception ought to be recognized to the general requirement was not before the Court.  Kwong Wah Restaurant involved a situation in which the plaintiffs had not pursued administrative claims against the individual employees of the defendant restaurant, only against the restaurant employer.  83 F.3d at 504-505.  The Court affirmed the district court's finding that the requirement was not jurisdictional, as well as its finding that the individual defendants waived the defense by not raising it as an affirmative defense in their answers.  Id. at 505-506.  Kwong Wah Restaurant plainly does not prevent district courts from recognizing exceptions to the general requirement that a right-to-sue letter be obtained before filing suit.  KVCAP also cites Stimson v. Goodwill Industries, No. 99-335-P-H, 1999 WL 33117124 (D. Me. Dec. 20, 1999) (Cohen, U.S. Mag. J., Rec. Dec.).  That decision addressed a motion to dismiss filed by the defendant prior to the plaintiff's receipt of a right-to-sue letter and is, therefore, entirely consistent with the circuit court authority I have recommended the court rely on.

> reasonable person would find particular conduct hostile or abusive, a court must mull the totality of the circumstances, including factors such as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment.

Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005) (citing and quoting Faragher v. City of Boca Raton, 524 U.S. 775, 786-88 (1998)).  "When dealing with discriminatory harassment (e.g., harassment based on gender, race, or the like), there is seldom, if ever, a defensible purpose behind the injurious actions.  The only question is whether the bad acts, taken in the aggregate, are sufficiently severe or pervasive to constitute actionable harassment."  Id. at 92-93.

KVCAP's first challenge is that Tardif-Brann was not subjected to "unwelcome" harassment in the workplace.  (Mot. Summ. J. at 10.)  Assuming that there could ever be such a thing as "welcome" harassment, see Crowley, 303 F.3d at 395 (listing "unwelcome sexual harassment" as one of six elements in a claim of hostile work environment sexual harassment), I conclude that the summary judgment record could support a finding that Cochran's kissing, "booby hug" and some of his joking were offensive to and not welcomed by Tardif-Brann.

KVCAP's second challenge, that Cochran's conduct was not sufficiently severe or pervasive to support a hostile work environment claim, gets to the heart of the issue.  (Mot. Summ. J. at 11.)  KVCAP asserts that there were only four incidents over the course of 2003, not counting the "ongoing telling of jokes by Mr. Cochran."  (Id.)  I count more than four incidents:

1.      Comments regarding Tardif-Brann's thighs and buttocks;

2.      The "snatch to match" statement;

3.      The whistling and ogling incident, including the "if your man isn't taking
        care of you" statement;

4.      The grabbing and kissing ambush on the bus;

5.      The "booby hug" incident that sent Tardif-Brann into the bathroom feeling humiliated;

6.      Several kisses, attempted kisses or mock kisses to Tardif-Brann's neck;

7.      "Typical" comments about female employees' breasts, made in the open office area, such as comments about the size of Ms. Hooper's breasts, his "crawl through broken glass" statement in regard to the same and his commonplace references to Ms. Breton as "TBBT," "Tammy Big Tits" or "Tammy Big Boobs," also made in the open office area; and

8.      The "ongoing" telling of sexual jokes despite requests that he stop doing so.

In any event, KVCAP maintains that Tardif-Brann was subjected to Cochran's conduct on merely an episodic basis, not a pervasive one, because this conduct was spread out over a period of between six months and two years.  (Id. at 12.)  KVCAP cites Lee-Crespo v. Schering Plough Del Caribe Inc., 354 F.3d 34 (1st Cir. 2003), Chamberlin v. 101 Realty, Inc., 915 F.2d 777 (1st Cir. 1990), and Paquin v. MBNA Marketing Systems, Inc., 233 F. Supp. 2d 58, 64 (D. Me. 2002), in support of placing this case on the "episodic" and "merely offensive" side of the sexual harassment divide.  Before addressing those decisions in more detail, I note that "[t]he thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment."  Noviello, 398 F.3d at 92.  Although Tardif-Brann's is by no means the worst case of sexual harassment imaginable—she makes no pretense that it is—it would be unfortunate indeed for the court to find that, as a matter of law, Cochran's alleged behavior is but an ordinary vicissitude of the workplace.

15

In Lee-Crespo, the plaintiff brought a same-sex employment discrimination claim based on a hostile work environment theory.  354 F.3d at 37.  The factual basis for the claim concerned a female supervisor's telling of stories about the private lives of fellow employees, a suggestion by the supervisor that the female plaintiff received her job because the company's general manager was attracted to her, inquiries regarding where the plaintiff bought her clothes and whether she ever dated any of her customers, and other "boorish and unprofessional" conduct.  Id. at 38-39.  Comparing this case to Lee-Crespo is like comparing apples and oranges.

In Chamberlin, the plaintiff brought suit for a Title VII "wrongful discharge claim" based on three positive comments he made about her physical appearance, and two advances he made during lunches at restaurants, all of which occurred over the course of a four or five week period.  915 F.2d at 780.  The First Circuit was concerned that the way the plaintiff postured her claim blurred the line between a *quid pro quo* claim and a hostile work environment claim and concluded that the incidents were not sufficiently severe or pervasive to support the latter claim.  Id. at 782-83.  The Court affirmed, however, the trial court's judgment (bench trial) in favor of plaintiff's Title VII claim based on a *quid pro quo* analysis.  Id. at 783-85.  In effect, viewing the facts of Chamberlin objectively, the Court appears to have concluded that a supervisor does not engage in "severe and pervasive" harassment when he makes an unwelcome advance on an employee that is limited to compliments and hand touching and when the advances are not perpetual so as to become a basic condition of employment.

In Paquin, this court granted summary judgment to an employer where all of the incidents that made up the employee's hostile work environment claim occurred prior to the 300-day limitation period.  233 F. Supp. 2d at 62-63.  Nevertheless, the court concluded that even if the

claim were timely, the following acts performed over a four-month period by the plaintiff's

supervisor could not support a hostile environment claim:

1.    Telling the plaintiff, who had previously worked in the personal care

industry, that she could perform "personal care" on him;

2.    Responding to another employees comment about eating that he would

"eat" the plaintiff;

3.    Showing the plaintiff a picture of a naked man;

4.    Making reference to a customer named "Harry Dick"; and

5.    Jokingly telling the plaintiff that her husband had called and wanted her to

go home to watch pornographic movies.

Id. at 61.  The court concluded that this handful of incidents could not be "considered so

physically threatening or humiliating as to unreasonably interfere with Plaintiff's job

performance" and fell "well short of the frequency required to amount to an abusive working

environment."  Id. at 64.  Significantly, none of these incidents involved touching or physically

restraining the plaintiff's movement.

     KVCAP argues that Tardif-Brann's claim cannot be severe and pervasive if the claims in

Chamberlin and Paquin were not, especially because Chamberlin and Paquin involved

harassment from the plaintiff's supervisor, whereas this case involves a spare driver whose

primary duties were performed outside of the office.  (Mot. Summ. J. at 13-14.)  From KVCAP's

perspective, Cochran's behavior simply cannot be viewed as anything other than "the ordinary

tribulations of the workplace" because a "reasonable person in the plaintiff's position" would

have viewed Cochran's behavior as "ordinary socializing [or mere] intersexual flirtation."  (Mot.

Summ. J. at 16-17, quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).

I conclude that Tardif-Brann's summary judgment presentation is sufficient to support the requisite finding that Cochran's behavior was worse than merely "offensive"[10] and was also common place and persistent enough to perpetuate a sexually hostile work environment.[11]  I so conclude because Cochran's conduct included humiliating physical touching and his behavior had become unpredictable enough that, according to Tardif-Brann and Ms. Hooper, they would rather leave their workstations than be in physical proximity to him.  In my assessment, the totality of these circumstances reflects that Cochran was more than a mere annoyance or offensive boor; he was someone the jury might reasonably consider as having been reasonably regarded by Tardif-Brann as a threat to her dignity and her person, solely by virtue of her "sex."

According to KVCAP, even if Cochran's conduct could be viewed as objectively hostile or abusive, the record demonstrates that Tardif-Brann was not subjectively intimidated or cowed by Cochran's behavior.  In support of this contention, KVCAP points primarily to Tardif-Brann's "resignation letter," which makes no reference to Cochran as a cause of her unhappiness in the workplace.  (Mot. Summ. J. at 17.)  KVCAP also point to the letter as evidence of the fact that Tardif-Brann was a vocal person who was not shy to complain about perceived injustices in the workplace.  Why then, asks KVCAP in rhetorical fashion, did Tardif-Brann not file a formal complaint with the appropriate personnel concerning Cochran's behavior?  (Id. at 17-18.)  KVCAP also wonders why, if KVCAP's office environment was so bad, Tardif-Brann begged to keep her job after being informed that KVCAP had "accepted" her "retirement."  (Id. at 18.)  In my assessment, these arguments and the others KVCAP offers at pages 17-19 of its summary

---

[10]     At page 13 of KVCAP's memorandum and elsewhere, KVCAP argues that summary judgment must enter against the hostile work environment claim because the conditions created by Cochran were not "intolerable."  That standard, of course, applies only to the question of whether KVCAP could be held accountable for Tardif-Brann's lost wages based on a constructive discharge theory.  See Marrero v. Goya of P.R., Inc., 304 F.3d 7, 28 (1st Cir. 2002).  The constructive discharge aspect of this case is discussed below.

[11]     Tardif-Brann does not have to prove both "severity" and "pervasiveness"; they are each factors for consideration and may or may not contribute to a hostile or abusive environment.  Noviello, 398 F.3d at 92.

judgment memorandum simply showcase what might well serve as KVCAP's closing argument at trial.  But the fact that KVCAP might have a briefcase full of such arguments simply does not undermine this court's summary judgment obligation to construe the record and draw the available inferences in favor of Tardif-Brann.  For each of KVCAP's barbs Tardif-Brann offers a suitable rebuttal.  Her letter did not mention Cochran because she was addressing a more immediate concern presented by management's failure to back her up with respect to scheduling issues (one of her primary work responsibilities) and to instruct KVCAP's drivers to conduct themselves in a professional and courteous manner when speaking with her, a circumstance that the jury might well conclude was apt to make her job extremely difficult, if not intolerable.  As for failing to pursue a sexual harassment claim with the appropriate officers, Tardif-Brann offers that she did raise the matter more than once with Simpson but did not take it beyond Simpson because Simpson had previously been angered when she had taken something "over his head."  And, more to the point, KVCAP itself acknowledges that Tardif-Brann's "failure to avail herself of the procedures implemented by KVCAP does not, in and of itself, shield KVCAP from liability."[12]  (Id. at 18 n.13.)  Indeed:

> [] Title VII comes into play before the harassing conduct leads to a nervous breakdown.  A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

---

[12]     See also 29 C.F.R. § 1604.11(d) ("With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.").

Harris, 510 U.S. at 22.  Finally, as for putting up with Cochran's behavior and begging for her job back, one could never be subjected to a hostile work environment involving persistent harassment over an appreciable period of time unless one was capable of "putting up with it." Moreover, Title VII is supposed to spare workers from the predicament of having to choose between employment in a hostile work environment, on the one hand, and unemployment, on the other.  Id.; Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986) (quoting Henson v. Dundee, 682 F.2d 897, 902 (1982)).

Of course, the fact that Tardif-Brann might have been subjected to a hostile work environment does not necessarily justify her suit against KVCAP.  "To establish employer liability for a non-supervisory co-employee, a plaintiff must demonstrate that the employer knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action."  Crowley, 303 F.3d at 401 (quotation marks omitted).  According to Tardif-Brann, she reported Cochran's harassment to Simpson, her supervisor and the head of the Augusta office, more than once.  Taking this assertion as true for purposes of the pending motion, it also appears from the record that KVCAP failed to take any action in response to the complaints.  Taking Tardif-Brann's assertions as true, one of the complaints she made to Simpson concerned the alleged "booby hug."  Certainly a report of such conduct should have goaded even the most hands-off supervisor into action, particularly in view of KVCAP's harassment policy, which requires managers to take prompt and appropriate action when notified of sexual harassment in the workplace.  I conclude that Tardif-Brann's summary judgment presentation generates a genuine issue on the question of KVCAP's knowledge and whether Simpson's alleged "better not do that shit in front of me" response constituted prompt and appropriate action under the circumstances.  Accordingly, I recommend that the court deny

KVCAP's motion for summary judgment with respect to counts I and IV.  In my view, Tardif-Brann's presentation of her hostile work environment claim is sufficient to go before a jury.

## III.  Retaliation

Tardif-Brann asserts in her complaint that KVCAP violated Title VII "by terminating her . . . because of her complaints of the hostile work environment."  (Compl. ¶ 29.)  According to KVCAP, Tardif-Brann cannot succeed on this claim because she cannot demonstrate that she was terminated, cannot demonstrate that her hostile work environment complaints were the cause of any adverse employment action and cannot demonstrate that KVCAP's non-discriminatory justification for "accepting her retirement" is a pretext for unlawful retaliation.  (Mot. Summ. J. at 23-24.)  To demonstrate that she has a prima facie claim of retaliation, Tardif-Brann must establish that (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action.  Calero-Cerezo v. United States Dep't of Justice, 255 F.3d 6, 25 (1st Cir. 2004).  KVCAP challenges Tardif-Brann's ability to meet each of these elements.  (Mot. Summ. J. at 23.)  In addition, KVCAP offers a legitimate, non-discriminatory reason for "accepting" Tardif-Brann's "retirement": it viewed Tardif-Brann's demand that several drivers be fired as an inappropriate ultimatum that called for her termination (or acceptance of her resignation) based on unacceptable insubordination.  (Mot. Summ. J. at 22; Def.'s Statement ¶¶ 26-30.)  In her responsive memorandum Tardif-Brann does not offer any argument suggesting that KVCAP's non-discriminatory rationale is pretext for retaliation.  Nor does she present persuasive circumstantial evidence of causation such as a very close temporal proximity between her complaints to Simpson concerning Cochran's behavior and the termination of her employment.[13]

---

[13]     In this Circuit, as in others, plaintiffs who seek to prove retaliatory motive based exclusively on the timing of an adverse employment action must have evidence reflecting "very close" temporal proximity.  Bishop v. Bell

Instead, Tardif-Brann appears to argue that KVCAP's rationale proves her case because her letter complaint about the way various drivers were treating her was itself protected activity. According to Tardif-Brann, even if those drivers were being rude and abusive to her for a reason other than her membership in a protected category, it was nevertheless reasonable for her to believe that they were violating Title VII, and therefore her complaint amounted to protected activity. (Summ. J. Opp'n Mem. at 14-15.) In support of this proposition Tardif-Brann cites Benoit v. Technical Manufacturing Corp., 331 F.3d 166 (1st Cir. 2003). In Benoit, the employee-plaintiff complained to his supervisors about perceived racial discrimination more than a year prior to his discharge from employment. Id. at 175. His complaint alleged, among other things, that he was fired as a result of racial animus and also that he was fired in retaliation for complaining about what he perceived as racial discrimination. Id. at 172. The First Circuit Court of Appeals affirmed a finding that the discriminatory firing claim failed because of a lack of evidence that the employer's rationale for firing the plaintiff was pretextual. Id. at 174. The court considered the retaliation claim independently of the discriminatory firing claim, observing that "the employment activity or practice that [the plaintiff] opposed need not be a Title VII violation so long as [the plaintiff] had a reasonable belief that it was, and he communicated that belief to his employer in good faith." Id. at 175. However, even though the plaintiff's complaint about perceived racial discrimination was protected activity, the Court concluded that the

---

Atl. Corp., 299 F.3d 53, 60 (1st Cir. 2002) ("If temporal proximity is the only evidence of causality establishing prima facie retaliation, proximity must be very close . . . ."). Tardif-Brann has failed to indicate in her statement of material facts when in 2003 she complained to Simpson about Cochran's behavior. Because her employment ended in November, it is possible that several months elapsed between the alleged complaint and her termination. In other words, she fails to demonstrate "very close" temporal proximity between her alleged last complaint to Simpson and her termination. Nor do the facts she has presented support an inference of very close temporal proximity. There simply are no clues as to when in 2003 the so-called "booby hug" incident occurred, the event that allegedly motivated her to complain to Simpson the second time. Compare Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (holding that the fact the defendant terminated the plaintiff immediately after he returned from medical leave and requested an accommodation would support an inference of retaliation where the record also lacked evidence of insubordination sufficient to undercut that inference).

plaintiff could not prove a causal link between the activity and his termination because "the sum and substance of his retaliation evidence" was that he was fired roughly a year after complaining. Id.  Unlike the circumstances presented in Benoit, Tardif-Brann asserts that her termination was causally connected to a complaint she made not about unlawful discrimination, but about rude behavior by co-employees that was related to their displeasure with Tardif-Brann's performance of her scheduling and dispatching duties.  Tardif-Brann makes no attempt in her summary judgment memorandum to articulate why it was reasonable for her to conclude that the actions by KVCAP's drivers were unlawful under Title VII.  Nor is it apparent to me how their conduct would implicate the protections afforded to Tardif-Brann under Title VII.  This case is unlike the classic claim that the employer allowed co-employees to perpetrate a hostile work environment so as to create a retaliatory adverse employment action because the plaintiff had engaged in protected activity.  See Noviello, 318 F.3d at 88.  Tardif-Brann's summary judgment record makes no evidentiary connection between the other van drivers' hostility and her earlier complaints about Cochran, nor does she even argue that the court should draw that inference on its own.  Because Tardif-Brann (1) fails to make a case that her termination was causally connected to her complaints about Cochran's behavior; (2) fails to demonstrate that the issues she was having with other drivers were in any way Title VII or MHRA concerns, such that her complaint to Simpson about the same could reasonably be viewed as activity protected under either statutory scheme; and (3) fails to provide sufficient evidence for a jury to disbelieve that her termination was a product of her "insubordinate ultimatum," I recommend that the court grant summary judgment against count II, Tardif-Brann's Title VII retaliation claim.

## IV.    Constructive Discharge

Tardif-Brann's final claim is that she was constructively discharged from employment. According to Tardif-Brann, her "position is that the combined sexual harassment by Cochran and the non-sexual harassment . . . by the drivers Case, Morin and Parker created intolerable conditions." (Summ. J. Opp'n Mem. at 15.)  In  order to satisfy the constructive discharge standard, Tardif-Brann must produce sufficient evidence for a jury to find that the harassment she was subjected to was "so severe and oppressive that staying on the job while seeking redress [would have been] 'intolerable,'" Lee-Crespo, 354 F.3d at 45, such that "a reasonable person in the employee's position would have felt compelled to resign," Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000).  As the verbiage suggests, the constructive discharge standard is more onerous than the hostile work environment standard.  Pa. State Police v. Suders, 542 U.S. 129 (2004) (describing the constructive discharge theory as requiring a "further showing" beyond that necessary to support a hostile work environment claim).  By relying on the non-sexual harassment of the other drivers in support of this claim, Tardif-Brann effectively concedes that Cochran's harassment did not, in itself, make the work environment intolerable or compel her to resign.  Even in the absence of such a concession, I would independently conclude that summary judgment should enter against this claim because the circumstances surrounding Cochran's harassment were not the cause of Tardif-Brann's resignation.  To the contrary, it is apparent from the record that Tardif-Brann's termination/resignation was precipitated by the other drivers' non-sexual harassment and the manner of Tardif-Brann's response to it.  Because non-sexual harassment is the essence of Tardif-Brann's assertion that her work environment had become intolerable, it is apparent that this claim is not tethered to the protections afforded by Title VII or the MHRA and is, therefore, not actionable.  See Lee-Crespo, 354 F.3d at 43 n.5 (noting that the

plaintiff could not meet the "severe or pervasive" standard of a "constructive employment action theory" based on harassment that was unrelated to her membership in a protected category). Stated in another fashion, it is undisputed that Cochran's behavior and Simpson's alleged non-responsiveness to Tardif-Brann's complaints about Cochran did not cause Tardif-Brann to retire or threaten to retire.[14] Accordingly, I recommend that the court grant defendant's motion for summary judgment with respect to count III and that portion of count IV that might be construed as asserting a state law constructive discharge claim.

## V.   The MHRA Count

In count IV of her complaint, Tardif-Brann alleges a violation of the Maine Human Rights Act. As grounds for this claim, Tardif-Brann asserts, exclusively, her hostile work environment theory; she makes no mention of either her retaliation theory or her constructive discharge theory under count IV. (See Compl. ¶¶ 36-39.) The parties appear to be in agreement that this claim is to be evaluated according to the same standards as Tardif-Brann's Title VII hostile work environment claim. KVCAP specifically so states in its memorandum of law (Mot. Summ. J. at 27-28) and Tardif-Brann does nothing to contradict the assertion in her responsive memorandum. In fact, Tardif-Brann makes no mention of the MHRA in her memorandum. Despite this omission, I recommend that the court deny the motion for summary judgment with respect to count IV for the reasons given in section II of my discussion, above. See Bowen v. Dep't of Human Serv., 606 A.2d 1051, 1053 (Me. 1992) (following federal precedent in evaluating a hostile work environment claim brought under the MHRA). In any event, even if

---

[14]   Tardif-Brann's failure to demonstrate close temporal proximity between her complaint regarding Cochran's sexual harassment and her termination/resignation also undercuts the causation element of her constructive discharge claim because it deprives the jury of the kind of circumstantial evidence from which it might infer causation. See, e.g., Smith v. Bath Iron Works Corp., 943 F.2d 164, 167 (1st Cir. 1991) (affirming summary judgment in favor of employer on a constructive discharge claim where plaintiff's retirement came 6 months after the last episode of discrimination).

the court were to construe count IV as raising all of Tardif-Brann's theories of relief, the disposition of those theories of relief would not differ under the MHRA because the only viable claim presented by Tardif-Brann is her hostile work environment claim.  See Me. Human Rights Comm'n v. Me. Dep't of Def. & Veterans' Serv., 627 A.2d 1005, 1007 (Me. 1993) (following federal precedent in evaluating a retaliation claim brought under the MHRA); King v. Bangor Fed. Credit Union, 611 A.2d 80, 82 (Me. 1992) (following federal precedent in evaluating a constructive discharge claim brought under the MHRA).

## Conclusion

For the reasons stated above, I **RECOMMEND** that the court **GRANT**, **IN PART**, the defendant's motion for summary judgment with respect to the plaintiff's retaliation and constructive discharge claims, which are asserted in counts II and III, and **DENY**, **IN PART**, the motion with respect to the plaintiff's hostile work environment claim, which is asserted in count I (Title VII) and also in count IV (MHRA).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.


/s/Margaret J. Kravchuk
U.S. Magistrate Judge

Dated:  July 21, 2005